IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Denise L. Brown,                              )
                                             )         Civil Action No. 6:13-2939-BHH-KFM
                      Plaintiff,              )
                                             )         **REPORT OF MAGISTRATE JUDGE**
        vs.                                   )
                                             )
Carolyn W. Colvin, Acting                     )
Commissioner of Social Security,              )
                                             )
                      Defendant.              )
                                             )

        This case is before the court for a report and recommendation pursuant to

Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases

in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

        The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying her claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

        The plaintiff filed applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits on February 24, 2011, alleging that she

became unable to work on September 15, 2009. The applications were denied initially and

on reconsideration by the Social Security Administration. On February 17, 2012, the

plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff

and Josephine A. Doherty, an impartial vocational expert, appeared on July 31, 2012,

---

[1]A report and recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on September 6, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  At the hearing, the plaintiff amended her alleged onset date of disability to April 14, 2010.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 11, 2013.  The plaintiff then filed this action for judicial review.

The plaintiff previously applied for disability in 2007, but her application was denied in a 2010 decision (Tr. 61-83).

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
> (2)    The claimant has not engaged in substantial gainful activity since April 14, 2010, the amended alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: degenerative disc disease, asthma, vertigo, tremors, headaches, depression, and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  Light exertional work involves lifting and carrying 20 pounds occasionally and 10 pounds frequently as well as an ability to sit, stand, and walk for 6 hours in an 8-hour workday.  The claimant is limited to no climbing or balancing and no exposure to temperature extremes, high humidity, unprotected heights, dangerous machinery, or pulmonary irritants.  The claimant is further limited to simple repetitive tasks with no contact with the general public,

2

occasional contact with coworkers and supervisors, and no work in fast-paced production environment.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on November 18, 1965, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from April 14, 2010, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he or she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

4

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was born on November 18, 1965, and was 44 years old on her alleged disability onset date and 46 years old at the time of the ALJ's decision. She completed high school and one year of college. She has not worked since September 15, 2009 (Tr. 225). The plaintiff has past relevant work as a school bus driver and truck driver.

***Medical Evidence***

On February 18, 2009, John F. Ansley, M.D., an Ear, Nose, and Throat ("ENT") specialist, evaluated the plaintiff for complaints of dizziness, vertigo, decreased hearing in both ears, and some ringing.  A recent hearing test had shown bilateral sensorineural hearing loss, left greater than right (Tr. 269).  Dr. Ansley's assessment was Meniere's disease (inner ear disorder causing vertigo).  A diuretic and a low-salt diet were recommended.  The plaintiff continued to have some difficulty with a report of tinnitus on March 27, 2009.  On May 8, 2009, she was having continued difficulty with congestion, dizziness, and generally not feeling well.  She reported losing consciousness (Tr. 263).  Dr. Ansley referred her for an MRI.  In a follow-up on June 12, 2009, Dr. Ansley noted that her brain MRI was normal (Tr. 267).  He recommended that she see a neurologist (Tr. 262).

On August 12, 2009, the plaintiff was examined by her primary care physician, Joseph Benich, M.D., at East Cooper Family Medicine, a clinic operated by the Medical University of South Carolina ("MUSC").  She was being seen for her hypertension and a rash.  Her history included vertigo, likely Benign Paroxysmal Positional Vertigo ("BPPV") for which she took Antivert, and numerous allergies.  Dr. Benich assessed her rash as a likely allergic reaction (Tr. 386-88).  The next month, the plaintiff told Dr. Benich that her chronic right hip and knee pain had been worse over the past couple of months (Tr. 383-84).  She also reported continued depression for which she took Paxil.  Dr. Benich confirmed that she used a cane to help her walk.  On exam, Dr. Benich found that her right hip had full range of motion, but her right knee was mildly tender to palpation.  He suspected osteoarthritis and planned to obtain x-rays (Tr. 383-84).

On October 12, 2009, the plaintiff underwent testing at Lowcountry Balance and Hearing, on referral from Edward Behrens, M.D., a neurologist (Tr. 279).  Her history included aural fullness and otalgia in the left ear.  There was a history of swelling around the mandibular process, and TMJ had not been ruled out.  Bilateral tinnitus had been

6

reported.  She had sustained a right leg injury in an accident with a surgery resulting in peripheral neuropathy in that leg.  She had a history of headaches, light sensitivity, and sound sensitivity.  The plaintiff had been experiencing episodes of vertigo since January 2008 and believed she had loss of consciousness on two separate occasions, though they had not been confirmed.  She had experienced persistent vertigo for approximately two weeks up to the date of this examination.  The examiner concluded that there was an overwhelming amount of evidence of migraines.  Vestibular rehabilitation was strongly encouraged after the migraines had been ruled out or effectively managed (Tr. 282).

Also in October 2009, Dr. Benich reported continuing vertigo symptoms, with Meclizine (Antivert) and Epley maneuvers providing some relief.  She was frustrated that vertigo symptoms kept her from working as a bus driver.  She was dizzy at the appointment and was scheduled for vertigo testing.  The plaintiff also had urinary incontinence that was worsening.  She had uncontrolled depression.  She was unable to take Paxil because it made her feel "not herself."  He switched her from Paxil to Prozac and prescribed Detrol and Kegel exercises to address urinary incontinence (Tr. 378-79).  In a visit a couple of weeks later, the plaintiff's headaches were continuing.  Her ENT doctor recommended discontinuing the Meclizine and continuing vestibular training, as well as treatment for migraines first.  Beta blockers had not helped.  The plaintiff was also having intermittent tremors of her head and arms.  A recent MRI was non-revealing, but had to be performed without contrast due to her allergy.  Her dizziness was also better.  The plan was to treat migraines with Amitriptyline (Elavil) and Imitrex for breakthrough, continue vestibular training, start Detrol, and keep an upcoming neurology appointment (Tr. 376-77).  Additionally, knee x-rays in October showed "mild" joint space narrowing (Tr. 270-71, 277).  Hip x-rays showed a "small calcification" (Tr. 272-73, 275).

On November 16, 2009, Dr. Benich reported that the plaintiff's vertigo was occurring less frequently and less intensely.  The plaintiff told Dr. Benich that she wanted

7

to get back to work as soon as possible.  She was seeing a neurologist and an ENT, who had changed her medications and added Phenergan.  She was still having vertigo most days of the week and was afraid to drive (Tr. 374-75).

On November 24, 2009, the plaintiff visited Thomas S. Hughes, M.D., a neurologist with Tidewater Neurology at the request of Dr. Benich.  Following a complete review of the plaintiff's medical history and an examination, Dr. Hughes' impression was chronic daily headaches/migraines, which improved when she stopped taking painkillers and caffeine.  Her chronic vertigo was resolved, and her tremors were caused by excessive use of Promethazine.  Dr. Hughes also noted her non-compliance due to confusion about treatment.  He recommended increased Prozac, continuing Amitriptyline, remaining off of analgesics, caffeine, and triptans, stopping Promethazine, and using Vistaril every six hours as needed until an episodic headache pattern could be established (Tr. 283).

On December 1, 2009, the plaintiff saw Hamid Bahadori, M.D., a neurologist with the Carolina Neurological Clinic.  Dr. Bahadori conducted a neurological consultation for migraine headaches, on referral from Dr. Behrens (Tr. 292).  The plaintiff described a history of headaches for two years and stated that they had intensified over the past six months.  She experienced headaches three to four days per week.  She described pain in the occipital region, neck tightness and frontal throbbing, as well as associated photophobia and phonophobia. She reported vertigo and dizziness.  Valium and Meclizine had not resolved her vertigo.  She had some shaking, though slightly decreased after stopping Phenergan.  She did not feel Amitriptyline was helpful.  On Dr. Bahadori's examination,

finger-to-nose testing revealed dysmetria[2] and dystonia[3] of the head from side-to-side while seated. Dr. Bahadori's impression was migraine headache and chronic daily headache. He started the plaintiff on Keppra and ordered her not to take Amitriptyline, Phenergan, or Imitrex. He gave her Lortab. He suggested possible nerve block injections or even Botox if her symptoms persisted (Tr. 292-94.)

> The plaintiff returned to Dr. Bahadori on January 13, 2010. She reported that her headaches and shaking had improved, and Tramadol had been helpful. Her vertigo was still causing her problems (Tr. 290). On exam, Dr. Bahadori again noted dysmetria and constant dystonia, which he could not stop by placing his hand on the top of the plaintiff's head. She was walking with a cane. Dr. Bahadori suggested an occipital nerve block, but the plaintiff declined that procedure. His plan was to keep her on Keppra (but he could not increase dosage due to side effects) and possibly switch medications if she did not experience continued improvement (Tr. 291).

> During a visit with Dr. Benich on March 17, 2010, the plaintiff reported that she had been experiencing four to five days of pain in the epigastric/right upper quadrant. She was acutely ill-appearing and tender to palpation diffusely. Dr. Benich assessed likely cramping secondary to gastroenteritis. He prescribed hydration and Zofran for nausea (Tr. 372-73.)

> At the next visit on April 14, 2010, Dr. Bahadori again noted dysmetria and a constant shake of the plaintiff's whole body. He noted that there was "not much improvement" since her last visit and that the symptoms got worse when the plaintiff took

---

[2] "Dysmetria" is the lack of coordination of movement typified by under- or over-shooting the intended position with the hand, arm, leg, or eye.

[3] "Dystonia" is a movement disorder in which sustained muscle contractions cause twisting and repetitive movements or abnormal postures.

9

allergy medication. The constant movement caused her neck pain and made her tired. Dr. Bahadori started the plaintiff on Artane, and continued her on Keppra and Tramadol (Tr. 287-88.) On June 9, 2010, Dr. Bahadori wrote that the Artane helped the shake, but caused itching and a rash, so the plaintiff had stopped taking it. On exam, Dr. Bahadori noted some scanning in her speech,[4] constant shaking of the body, and walking with a cane. Dr. Bahadori switched the plaintiff from Artane to Mirapex and restarted Keppra (Tr. 285-86.)

The plaintiff returned to Dr. Benich on May 14, 2010. She was having "seizures" every two to five days, which caused changes in speech pattern, dysphasia, vertigo, whole-body tremors, loss of consciousness, and possible postictal symptoms (disorienting symptoms after a seizure). The plaintiff was taking a "new" seizure medication and was referred to MUSC neurology for a consultation (Tr. 369-71).

Dr. Benich wrote an opinion in June 2010, stating that treatment should allow the plaintiff to function without limitations and provided for certain current limitations (Tr. 755-60).

On July 7, 2010, the plaintiff presented to Dr. Benich with a six-week history of intermittent abdominal pain. Fevers had been present off and on for one month (Tr. 367-68). A right upper quadrant ultrasound taken on June 10, 2010, showed that the plaintiff's gallbladder was contracted, but no evidence of acute cholecystitis or cholelithiasis (Tr. 407). She was noted to be acutely ill-appearing and seemed tired. She was tender to palpation in the liver and the right upper quadrant. She was referred for a HIDA scan and lab work for possible gallbladder or parasite issues. She was also given antibiotics for a skin abscess (Tr. 367-68). Two days later, she reported to Dr. Benich that she felt better with the antibiotics, but was still experiencing abdominal pain. Dr. Benich suspected biliary

---

[4] "Scanning" is the syndrome of placing pauses between each syllable of a word and is a sign of potential neurological issue.

disease. In addition to the order for the HIDA scan, she was given Prilosec for possible GERD/gastritis (Tr. 364-65). The HIDA scan on July 20, 2010, was normal (Tr. 405).

On July 23, 2010, the plaintiff was seen for a neurology consultation by Rup Sainju, M.D., a resident at the MUSC Neurology Department. She reported seizure episodes, which had started several years earlier. She described shakiness of her head, chin, lip, and sometimes arms and legs. She was completely conscious during these episodes, but sometimes experienced disorientation, confusion, stammering or stuttering of words, as well as loss of balance. She felt that she sometimes passed out. The plaintiff also complained of migraines (Tr. 358). In addition, she described depression and PTSD symptoms. When she was young, she was sexually abused multiple times by her father, and her ex-husband used to beat her up and have forceful sex. She had seen a psychiatrist several years ago, but he tried to touch her and she stopped seeing him (Tr. 359). Examination revealed a chin and hand tremor and slight stuttering of speech. The plaintiff described the shakiness observed in the clinic as a "small seizure." There was generalized abdominal tenderness. Increased muscle tone of the trapezius muscles was also noted. Dr. Sainju noted that the plaintiff had a "significant psychiatric history" with history of sexual abuse, possible undiagnosed depression, and possible PTSD along with migraines. Dr. Sainju concluded the tremors were not neurologic, but rather psychiatric (Tr. 362). The plaintiff was ordered to not drive, swim, or operate heavy equipment, and to avoid heights and being close to a fire. She was to keep her appointment with the movements clinic and obtain an electroencephalogram ("EEG") (Tr. 359-63.)

On August 16, 2010, the plaintiff underwent an outpatient EEG. The hyperventilation procedure portion of the test could not be performed due to the plaintiff's hypertension. The EEG was normal (Tr. 413).

On September 20, 2010, the plaintiff was evaluated by T. Karl Byrne, M.D., a surgeon with the MUSC Gastroenterology Surgery Department. Dr. Byrne reviewed her

medical records, specifically her history of abdominal pain and seizure work-up.  He noted that on the day of his examination she had a tremor that was "pretty noticeable in her face, particularly in her lips."  He also noted a slight tremor in the hands.  Her abdomen was tender all over, but worst in the right lower quadrant.  He noted that an ultrasound of the gallbladder as well as the HIDA scan had been normal.  Dr. Byrne suggested a colonoscopy and upper-GI endoscopy (Tr. 354-55).  The plaintiff had the colonoscopy and endoscopy on October 15, 2010.  Both tests were normal, but one small polyp was removed during the colonscopy (Tr. 349).

Dr. Sainju met with the plaintiff again on September 29, 2010.  She questioned him about his referral for a psychiatric evaluation, which he had made due to symptoms of depression and signs of possible PTSD in her medical history.  Dr. Sainju noted the seizures were questionable and told the plaintiff that she did not have epilepsy.  Her EEG did not show any seizure activity.  She became upset and left the clinic before he could examine her or discuss her situation further (Tr. 351-53.)

The plaintiff saw Dr. Benich on October 25, 2010, and explained that she had become upset because she felt that Dr. Sainju was telling her that her seizures were of psychiatric origin, and she felt that they were real.  She was taking Prozac, reported no homicidal or suicidal thoughts, and continued to decline further psychiatric treatment.  Her abdominal pain was resolved, and Dr. Benich opined that she had been suffering from irritable bowel syndrome ("IBS") (Tr. 347-48).

When she returned to Dr. Benich on January 3, 2011, she reported increased depressive symptoms including poor sleep, appetite, and energy.  She had significant fear about her symptoms and her life. Dr. Benich noted labile mood, poor insight, and flat to sad affect at that visit.  His assessment was major depressive disorder, recurrent and moderate, as well as tremors resulting from somatization/conversion.  He described her PTSD, depression, and anxiety as "significant."  He noted that neurologists thought her alleged

12

seizures were non-physical and concluded, "Suspect [symptoms are] a result of somatization/conversion. " Her Prozac was increased, and exercise was suggested (Tr. 345-46).

In a State psychiatric review dated May 27, 2011, Holly Hadley, Psy.D., opined that the plaintiff could do simple, repetitive, low stress work with no ongoing public interaction (Tr. 308). Michael Meboschick, Ph.D., arrived at a similar conclusion in a January 2012 state psychiatric review (Tr. 439).

On June 2, 2011, the plaintiff met with Braxton Wannamaker, M.D., the attending physician at the MUSC Neurology Department. Dr. Wannamaker noted that Dr. Benich's notes indicated that the plaintiff continued to complain of the seizure-like events. On examination, Dr. Wannamaker noted limited concentration, involuntary jaw tremor, and slight head tremor. There was some clumsiness with rapid alternating movements. She had some slight balance problems with her eyes closed. Dr. Wannamaker concluded that the plaintiff did have some involuntary jaw and head tremor as well as some subtle cerebellar findings. He recommended a repeat brain MRI and a six-hour EEG video-monitoring session, prior to which she would be tapered off her medications (Tr. 340-42). The plaintiff underwent another, more extensive, EEG, on June 23, 2011. There were no ictal events or abnormalities, but one non-epileptic event. A "likely" diagnosis was nonepileptic events. However, simple partial seizure could not be completely ruled out (Tr. 394). On June 27, 2011, the plaintiff called Dr. Wannamaker's nurse stating that she had experienced nausea and vomiting since restarting Keppra after her EEG. Dr. Wannamaker wrote that these symptoms were not likely to be caused by the Keppra and recommended that she contact her primary care physician (Tr. 339).

A brain MRI was conducted on July 8, 2011. The cerebellum and brainstem were normal. There was a subtle questionable area of increased T2 signal in the left mesial

13

temporal lobe.  Correlation with EEG testing was suggested for possible mesial temporal sclerosis (Tr. 393, 577).

Dr. Wannamaker saw the plaintiff again on August 25, 2011, and noted that she continued to be "somewhat of an enigma."  Her recent brain MRI was unremarkable. He noted "it is difficult for her to tell me how the tremor, when exacerbated, affects her lifestyle" (Tr. 336).  Her gait was assisted with a walking cane, she favored her right knee which had been injured in the past, and her gait was a little wide-based.  The doctor wrote, "There is substantial variation in her tremor during the exam," and concluded she had episodic vertigo and tinnitus and tremor of unknown etiology. He also noted, "I do not think she has epilepsy" (Tr. 336).   There was no "persistent" evidence for epilepsy.   Dr. Wannamaker asked her to stop taking Keppra and referred her for evaluations with the Movement Disorder Group and ENT Department.   He would see her following those evaluations (Tr. 336-37).

In September 2011, the plaintiff saw Dr. Benich.  Dr. Benich noted that Dr. Wannamaker felt the plaintiff did not have epilepsy but had a tremor disorder.  Although Dr. Wannamaker had asked her to stop the Keppra, the plaintiff had continued taking it because she had "seizures" if she stopped taking it for one or two days.  The plaintiff also complained of persistent headache and painful urination.  Dr. Benich felt the plaintiff's symptoms were consistent with BPPV or Meniere's disease and encouraged her to stay off the Keppra.  The plaintiff also complained of tinnitus and diarrhea (Tr. 334-35).  The same day, Dr. Benich wrote a letter indicating that the plaintiff was not to drive, that she had osteoarthritis affecting her hips and knees, as well as depression and hypertension.  This was all in addition to her ongoing symptoms of seizure-like activity, tremor, and vertigo (Tr. 565).

On September 30, 2011, Sanjay Kumar, M.D., conducted a "vocational rehabilitation" examination of the plaintiff.  The plaintiff reported knee pain requiring a cane,

14

diarrhea, seizures, and back pain.  He noted that the plaintiff had an intermittent tremor.  He felt it was hard to tell if the tremor was voluntary or involuntary.   Dr. Kumar also noted that the plaintiff was using a cane but had a normal gait.  His impression included anxiety state, unspecified; other forms of epilepsy and recurrent seizures (Tr. 314-16).

In an October 2011 State medical review, S. Farkas, M.D., concluded the plaintiff could do light work, limited by certain postural and environmental restrictions due to her seizure-type attacks and knee pain (Tr. 322–28).  In January 2012, Jim Liao, M.D., arrived at similar conclusions (Tr. 441-48).

On December 6, 2011, the plaintiff saw Ted Meyer, M.D., with the MUSC Department of Otolaryngology for an audiology evaluation.  Dr. Meyer noted that the test results were invalid, since the plaintiff kept her eyes closed during the testing after she was told to keep them open.  Dr. Meyer suspected that the plaintiff was exaggerating symptoms as he noted he was concerned about "secondary gain" (Tr. 508).[5]  Dr. Meyer concluded that the plaintiff did not have Meniere's disease, and he did not believe her ears were causing her vertigo, seizure activity, and syncope.  He also stated that there was likely a migraine component to her symptoms and encouraged treatment for better migraine control.  During his exam for her balance, Dr. Meyer watched the plaintiff walking down the hall.  She used a cane and did not appear to be very stable (Tr. 331, 391).

On January 13, 2012, the plaintiff was involved in a car accident.  She went to the emergency department the next day for neck and back pain (Tr. 499).  A cervical CT scan showed focal disc protrusion at C4-5 level causing mild central stenosis and no significant neuroforaminal narrowing (Tr. 426).   A lumbar CT demonstrated multilevel degenerative disc disease at L1 through S1, with mild to moderate left neuroforaminal narrowing at L3-4, and moderate to severe narrowing of the left neuroforamina at L4-5, and

---

[5]  Secondary gain is "advantage derived from an illness, such as . . . disability benefits." *Dorland's Illustrated Medical Dictionary*, 32nd Ed. (2012), p. 753.

moderate to severe central stenosis.  Bilateral ligamentum flavum hypertrophy and facet arthropathy also complicated the presentation.  The lumbar CT scan also revealed cystic severe hydronephrotic appearance of the left kidney with marked atrophy and cortical thinning and distention of the left ureter.  This kidney abnormality was "likely longstanding" (Tr. 423).  Dr. Benich's exam revealed some spinal tenderness, full strengh, and normal reflexes (Tr. 500).

On January 23, 2012, the plaintiff saw Katherine Gurchak, M.D., for pelvic pain and related symptoms.  Dr. Gurchak noted that the plaintiff was "[g]enerally in good health"; the plaintiff denied any depression or joint pain, and a physical examination was normal (Tr. 477).

The plaintiff saw Dr. Benich on January 25, 2012.  She continued to have neck and back pain as well as numbness and tingling in both hands and numbness in toes of both feet.  She was tender to palpation in the bilateral trapezius and along the spine. Dr. Benich noted decreased sensation to light touch in the fingers, right worse than left.  He referred her to neurosurgery for further examination and treatment.   He prescribed Oxycodone and naprosyn and referred her also to urology for the kidney issues noted on her spinal x-rays (Tr. 499-500).

The plaintiff was evaluated on February 2, 2012, by Eric S. Rovner, M.D., Professor of the Department of Urology at MUSC, in follow-up to the lumbar CT scan that revealed severe left hydronephrosis.  She complained of urinary incontinence, some of which dated back to her hysterectomy in 2005.  On examination, the plaintiff was "quite diffusely tender" with abdominal pain and flank pain since the automobile accident two weeks earlier.  There was no stress incontinence.  She had complete inability to voluntarily contract her pelvic floor.  Dr. Rovner's impression was asymptomatic left hydronephrosis, and he believed that her left kidney was probably completely dysfunctional.  A formal CT urogram was planned as well as a renal scan.  With respect to her voiding dysfunction, she

was to be set up for a voiding diary and pad test. She was changed from Detrol to Toviaz (Tr. 465-66).

In a follow-up with Dr. Rovner on February 29, 2012, the plaintiff reported some improvement with Toviaz. It was noted that she did drink a considerable amount of liquid, which may contribute to her symptoms. She was referred for videourodynamics and to a spine surgeon as well as evaluation for nephrectomy (Tr. 494).

The plaintiff returned to the MUSC Urology Department on March 12, 2012, and saw Stephen Savage, M.D., Director of Minimally Invasive Urology. Tests had shown that she had no function in her left kidney (Tr. 467, 470-72). During the office visit, she was highly agitated and suddenly said she could not walk. EMS was called to take her to the emergency room. When Dr. Savage spoke to the plaintiff a week later, "[s]he at first said this was her first seizure, and I reminded her that she had said she had them over the past 3 years" (Tr. 467).

On March 15, 2012, the plaintiff saw Dr. Benich. She reported continued weakness in her legs and was using a walker. She was frustrated that she did not have a diagnosis for her symptoms at this point. On exam, she was anxious but in no real distress. Dr. Benich noted her tremor as before. He recommended that she stop Toviaz and Detrol, because they had not been helping with her urinary incontinence, and he was concerned that they might be causing orthostatic hypotension (Tr. 488).

The plaintiff returned to Dr. Wannamaker on March 22, 2012, claiming she had a seizure in Dr. Savage's office where she bit her tongue (Tr. 485). Dr. Wannamaker noted that this was inconsistent with Dr. Savage's account (Tr. 467). The plaintiff complained of intermittent tremors, but her mother, who was present, said the plaintiff was walking normally with no tremor and no cane or walker. The plaintiff used a walker at the appointment, but examination revealed full strength and normal leg movement (Tr. 486). Dr. Wannamaker's assessment was non-epileptic attack disorder and gait disorder with no

17

objective findings of neurological impairment.  He recommended that she stay off of anti-epileptic drugs.  Dr. Wannamaker again encouraged the plaintiff to seek psychiatric or psychological help. He gave her a referral for Behavioral Medicine at MUSC and suggested that she also see the Walterboro Mental Health Clinic.  Dr. Wannamaker also wrote a consultation to physical therapy in Walterboro to improve her walking (Tr. 485-86).  Subsequently, the plaintiff cancelled an appointment at Behavioral Medicine because she could not afford it (Tr. 484).

### *Administrative Hearing Testimony*

The plaintiff testified that she could not do her school bus job due to losing consciousness while driving, "I started to pass out behind the wheel, and I ran the bus off the road with my kids on that" (Tr. 35).[6]  She said that she no longer drives and that her boyfriend drove her to the hearing (Tr. 34).

The plaintiff alleged many disabling symptoms, including mobility problems, "seizures," fatigue, falling, balance problems, dizziness, back pain, stomach pain, rectal bleeding, leg cramps, urinary incontinence, migraines, hearing loss, tremors, hand numbness, spine swelling, mood swings, "panic attacks," "blackouts," and asthma (Tr. 35–50).  She admitted she had "not gotten a true diagnosis yet" that would explain her alleged symptoms (Tr. 42, 54-55).

The plaintiff testified that she had tremors at least two times a week and that they lasted off and on most of the day.  She usually had to lie down, and it took a couple of days to recover from them (Tr. 43).  She further testified that she had problems sitting because of burning in her back, leg pulling sensation, and her legs were numb.  The plaintiff stated that she could sit for about 15 to 20 minutes before she started feeling tingling in her toes. She could stand for about ten to 15 minutes (Tr. 43-44).

---

[6]  In her prior disability application, the plaintiff alleged she lost the school bus job due to hip pain (Tr. 66).

The plaintiff mentioned she was going to see an orthopedist in September 2012 about her alleged hand numbness (Tr. 45).  However, the ALJ pointed out that Dr. Wannamaker recommended a psychiatrist, not an orthopedist.  The plaintiff responded that she could not afford psychiatrists and that there were no psychiatrists in Walterboro.  But the ALJ noted that orthopedists cost money too and asked why the plaintiff went against Dr. Wannamaker's advice.  The plaintiff said, "The doctor scheduled the appointment for me.  My family doctor scheduled the appointment for me because the amount of pain that I'm in and the swelling on my spine" (Tr. 46).[7]  The plaintiff stated that her chiropractor told her that he was doing adjustments because her seizures and tremors were caused by bone spurs of the spine not allowing blood to flow and oxygen to flow to the brain.  The plaintiff noted that her family doctor did not agree with that assessment.  She stated that the chiropractor was provided her medical records (Tr. 46-47).

When asked if she had been to counseling for depression or anxiety, the plaintiff responded that she had gone through some counseling with her pastor and with her doctor.  Her doctor had given her suggestions to try to help her relax, including breathing techniques (Tr. 50).

The plaintiff testified that she lived with her mother and father.  She testified that she cared for her personal hygiene, did laundry, did light cooking, read, kept up with church events, visited with other church members, and did physical therapy exercises. Sometimes her mother had to help her when she was having a bad day and her legs were weak (Tr. 51).

The plaintiff was also asked what symptoms she had from only one functioning kidney.  She responded that she had pain in her stomach and rectal bleeding

---

[7]  There does not appear to be any record of spine swelling at any time.  Dr. Benich's last exam before the hearing revealed only a "mild tremor of jaw and hands" (Tr. 489).  Dr. Wannamaker's last exam was entirely normal, with no tremor (Tr. 489).

periodically as well as cramping in the legs. She had to go to the bathroom about every half hour or so (Tr. 51-52). She explained that she had to wear incontinence panties because she lost control of her bladder about three times a day (Tr. 52-53).

The plaintiff testified that she had been to so many doctors with different opinions that she was very confused. She was unable to keep up with what each one says or the medications. She had become very discouraged and lost 40 pounds the previous year because of vomiting. She had gotten better after cutting back on the medications. (Tr. 53). In response to further questioning from the ALJ, the plaintiff explained she did not take any medication for the headaches, but instead applied a rolled up towel with ice. She was not able to take aspirin or over-the-counter medications because of her kidney. She was trying to keep her remaining good kidney working. She had also been having problems with her bowels and bloating and bleeding (Tr. 55-56).

### Vocational Expert Testimony

The vocational expert ("VE") described the plaintiff's past work as a bus driver and a truck driver, both of which were medium exertional level and semiskilled. She had also worked in furniture accounts in various positions, which were sedentary and unskilled (Tr. 57).

The ALJ presented the following hypothetical scenario to the VE:

-- Able to perform light work;

-- No climbing or balancing;

-- No exposure to temperature extremes, high humidity, or pulmonary irritants;

-- No exposure to unprotected heights or dangerous machinery;

-- Limited to simple repetitive tasks;

-- No contact with the general public; and

-- Only occasional contact with coworkers and supervisors.

(Tr. 57). The VE responded that such a person would not be able to perform any of the plaintiff's previous work. However, there were other jobs such a person could perform including mail sorter, retail marker, and an assembly worker (Tr. 57-58). The ALJ asked what effect there would be from an added restriction of no fast-paced production. The VE stated it would eliminate the assembly work position, but such a person could be a records processor (Tr. 57-58). The ALJ then asked if there were jobs for such a hypothetical worker who also would require unscheduled breaks of unpredictable duration and frequency during the course of the workday. The VE responded there were no jobs consistent with that limitation (Tr. 58).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to give "proper weight" to Dr. Benich's opinions; (2) failing to find that her seizure-like episodes and non-functioning kidney were severe impairments; (3) failing to accommodate all of her limitations in the residual functional capacity ("RFC") determination; and (4) relying on the VE's testimony (pl. brief at 1). In her reply brief, the plaintiff argues that her credibility is supported by the medical records, including her use of a cane (pl. reply at 4–5).

### Treating Physician Rule and Credibility

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or

21

similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The plaintiff contends that the ALJ failed to give "proper weight" to the opinions of her treating physician, Dr. Benich (pl. brief at 26-30). Dr. Benich gave several opinions. The report relied on by the plaintiff is a Multiple Impairment Questionnaire (Tr. 755–60) completed by Dr. Benich on December 27, 2010. In that questionnaire, Dr. Benich indicated that he began treating the plaintiff on August 12, 2009, had seen her most recently on October 25, 2010, and indicated that his frequency of treatment was one to three months. Although Dr. Benich diagnosed hypertension, migraine (headaches), tremor disorder, BPPV (benign paroxysmal positional vertigo), depression, and PTSD (post-traumatic stress disorder), he noted that "Patient should be able to improve and function without limitations with time, therapy" (Tr. 755). Secondly, while noting that he had not

been able to relieve the plaintiff's pain (Tr. 756), Dr. Benich indicated that, as to the plaintiff's RFC, the plaintiff could sit for five hours each day, could stand and walk for one hour, needed to "get up and move around" every fifteen to thirty minutes and wait five minutes before sitting again, could lift frequently zero to five pounds and five to ten pounds, could lift ten to twenty pounds occasionally, but could never lift more than more than twenty pounds or more than fifty pounds (Tr. 757).  Dr. Benich noted that the plaintiff would have limitations in doing repetitive tasks (such as reaching, handling, fingering, or lifting) because of her tremors and intermittent weakness and that the plaintiff's symptoms were likely to increase in a "competitive work environment" (Tr. 758).  The questionnaire completed by Dr. Benich also indicated the plaintiff had frequent pain, depression, and PTSD (Tr. 759). Dr. Benich also stated that: (1) "stressful situations" may cause exacerbation of flashbacks and symptoms (Tr. 759); (2) the plaintiff may need to take unscheduled breaks one to two times a day for ten minutes (*id*.); (3) the plaintiff's impairments were likely to produce "good days" and "bad days" (Tr. 760); (4) the plaintiff needed a job that permitted "ready access" to a restroom (Tr. 760); (5) the plaintiff had psychological limitations and needed to avoid noise and fumes (Tr. 760); and (6) the plaintiff's symptoms and limitations began on August 12, 2009 (Tr. 760).

Dr. Benich also completed a Certification of Health Care Provider (Form WH-380) on October 21, 2009, on the plaintiff for the United States Department of Labor (Tr. 761–63).  In that certification, Dr. Benich stated that the plaintiff could not perform her then-current job of driving a school bus because of vertigo, but "could  probably work a desk" (Tr. 761–62).   Dr. Benich also indicated that the plaintiff needed weekly physical therapy sessions and "vestibular rehab" sessions until her symptoms resolved (Tr. 762).

In August 2012, Dr. Benich completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" (Tr. 781–83).  Dr. Benich indicated that the plaintiff had no limitations with respect to understanding and carrying out simple work instructions,

23

making judgment on work-related items, carrying out complex instructions, and interacting appropriately with supervisors, co-workers, and the public (Tr. 781–82), Dr. Benich, however, noted:

> Patient has experienced periodic bouts with dizziness, tremors, seizure-like activity, weakness in limbs, that affects her ability to do manual labor.
>
> Patient has facial and bilateral upper extremity tremors. Her gait is slow and unsteady at times.

(Tr. 782).

Dr. Benich also completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" in August 2012 (Tr. 784–89). On that form, Dr. Benich indicated that the plaintiff could frequently lift or carry up to ten pounds, could occasionally lift or carry eleven to fifty pounds, but could never lift or carry twenty-one to fifty pounds or fifty-one to one hundred pounds (Tr. 784), could sit for two hours without interruption, could stand for one hour without interruption, and could walk for thirty minutes (Tr. 785). With respect to an eight-hour workday, Dr. Benich indicated that the plaintiff could sit for four hours, stand for two hours, walk for one hour, and could go thirty to forty feet without the use of a cane, which he deemed to be medically necessary (Tr. 785). Dr. Benich also checked the box indicating that, without a cane, the plaintiff could use her free hand to carry small objects (Tr. 785). Dr. Benich also noted that the plaintiff had bouts of tremors and limb weakness, which resulted in an "unsteady gait." (Tr. 785).

As to work-related tasks, Dr. Benich indicated that, with respect to her hands, the plaintiff could occasionally reach and push or pull and could frequently handle, finger, and feel with both her right hand and left hand (Tr. 786). Dr. Benich, however, noted that the plaintiff's tremors and weakness would limit her ability to perform manual dexterity tasks (Tr. 786). Dr. Benich indicated that the plaintiff could occasionally use her feet (Tr. 786), but was precluded from most postural activities because of weakness, tremors, and

24

"unsteady & unreliable limb function" (Tr. 787). As to environmental limitations, the plaintiff was completely precluded from unprotected heights, mechanical parts that move, operating a motor vehicle, extreme cold, and extreme heat, but could occasionally tolerate humidity, wetness, dust, odors, fumes, and pulmonary irritants, and work in a "Moderate (Office)" environment (Tr. 788). As to other daily activities, Dr. Benich indicated that the plaintiff should not travel without a companion, should not ambulate unassisted, walk a block on rough or uneven pavement, or climb stairs (Tr. 789).

The plaintiff specifically contends that the ALJ erred in his consideration of Dr. Benich's opinions as follows: (1) the ALJ accepted the recommendations of Dr. Benich as to lifting light weights, but not his limitations as to standing, walking, and manual dexterity (pl. brief at 26); (2) the ALJ accorded great weight to the findings, at the reconsideration stage, of non-examining physicians, who did not have the opportunity to review any evidence submitted after the reconsideration decision (*id*.); (3) the ALJ gave no other reason for according essentially no weight to Dr. Benich's most relevant determinations (*id*.); (4) the ALJ ignored, for no stated reason, Dr. Benich's other significant findings, including the medical necessity of a cane (*id*.); (5) the ALJ ignored the limitations determined by Dr. Benich in his assessment dated December 27, 2010, which was more comprehensive than the August 2012 interrogatory (*id*. at 27); (6) the record is replete with diagnoses of tremors, migraines, and vertigo by the clinical observations of the neurologists, ENT specialists, and a urologist, in addition to Dr. Benich (*id*.); (7) the ALJ "was not shy in 'playing doctor'" when he concluded that surgery for the kidney was not necessary and that the plaintiff should see a psychiatrist (*id*. at 27–28); (8) there is objective radiological evidence, which was not available to the neurologist who recommended a psychiatric referral, showing significant degenerative disc disease and "herniations" (*id*. at 28); (9) even if there was some evidence different from that reported by Dr. Benich, there

would still be no basis for rejecting his determinations (*id*. at 28); and (10) Dr. Benich's opinions would still be entitled to controlling weight under SSR 96-2p (*id*. at 29–30).

The Commissioner, however, contends that, because Dr. Benich did not provide a diagnosis to explain most of the limitations assessed, the ALJ properly assigned his findings less weight because it appeared that Dr. Benich's opinion was based on the plaintiff's subjective complaints (def. brief at 17–26). In the decision, the ALJ stated as follows:

> Although appropriate weight has been assigned to the assessments of Dr. Benich, the undersigned does not find the opinions regarding the claimant's residual functional capacity to be very credible. While the undersigned has followed Dr. Benich's recommendations regarding the lifting of light weight, the undersigned does not find his limitation regarding standing and walking and manual dexterity limitations to be credible in light of the lack of any specific diagnosis. Without a diagnosis, the physician is relying on the claimant's subjective complaints and limitations in completing forms.

(Tr. 20).

The undersigned finds that the ALJ gave adequate reasons for discounting Dr. Benich's opinions and that substantial evidence supports his findings. As noted by the ALJ, the plaintiff's underlying diagnoses did not support all of Dr. Benich's opined limitations (Tr. 20). None of the plaintiff's doctors found any medically determinable impairments that would support the plaintiff's tremors, alleged seizures, or alleged hearing loss (e.g., Tr. 336, 351–52, 362, 508). As the ALJ twice noted (Tr. 17, 18-19), Dr. Benich himself admitted "we still do not have a diagnosis despite her thorough workup" (Tr. 489). Although Dr. Benich noted that the plaintiff had a mild tremor of her jaw and hands, he recommended that she stop taking Toviaz and Detrol to see if those two medications were causing the "spells" that she was having and prescribed Zofran to replace the Phenergan (*id*.). Although the plaintiff's tremors are also described in 2010 by Dr. Bahadori (Tr. 285-88), Dr. Sainju (a neurologist) (Tr. 358-62), and Dr. Byrne (Tr. 354), Dr. Bahadori's examination of the plaintiff

was normal (Tr. 286-88), and Dr. Sainju concluded that the plaintiff's tremors were psychiatric in nature (Tr. 362). An EEG conducted on the plaintiff on June 23, 2011, at MUSC failed to show epilepsy (Tr. 394). On August 25, 2011, Dr. Wannamaker of MUSC noted that the plaintiff had a normal EEG and an "unremarkable" brain scan (Tr. 336). Dr. Wannamaker also concluded that the plaintiff did not have epilepsy (id.). While the plaintiff argues that "[t]he record is replete with diagnoses of tremors, migraines, and vertigo . . ." (pl. brief at 27), the undersigned agrees with the Commissioner that the treatment notes indicate the plaintiff's own description of her symptoms rather than diagnoses of such (def. brief at 19-20).

With regard to the plaintiff's alleged need for a cane, the ALJ correctly noted that no doctor prescribed one (Tr. 18). Further, as the ALJ also noted, "no severe pervasive gait disturbance was noted in the consultative report and the need for assistive device is not supported by the medical evidence of record" (id. (citing Tr. 314-20)). Doctors routinely found the plaintiff's leg strength, reflexes, and gait entirely normal, directly contradicting her alleged need for a cane or walker (Tr. 18; see Tr. 291, 477, 486, 500). Further, the plaintiff's mother reported to Dr. Wannamaker that the plaintiff "ambulat[ed] normally without walker and not having tremor," and Dr. Kumar noted the plaintiff had a cane but walked with a normal gait (Tr. 316, 485). The undersigned finds no error in this regard.

The plaintiff next alleges that the ALJ ignored the limitations determined by Dr. Benich in his assessment dated December 27, 2010. The ALJ acknowledged the opinion, stating: "Dr. Benich made numerous statements including a questionnaire completed on December 27, 2010, indicating that the claimant had a residual functional capacity for a limited range of light work in a low stress work environment" (Tr. 19). In his RFC finding, the ALJ also found that the plaintiff could perform a limited range of light work (Tr. 14). As acknowledged by the plaintiff, "Dr. Benich issued similar exertional and non-exertional limitations in August 2012" (pl. brief at 27). The ALJ discussed the August 2012

opinion and gave his reasons for not giving the opinion controlling weight (Tr. 19-20). To the extent the ALJ erred in failing to discuss the 2010 opinion in greater detail, the undersigned agrees with the Commissioner that the plaintiff has failed to show resulting harm. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The plaintiff further argues that the ALJ ignored Dr. Benich's opined mental limitations in the December 2010 opinion (pl. brief at 27). In that opinion, however, Dr. Benich only stated that the plaintiff had depression and PTSD, and, "Stressful situations may cause exacerbation of flashbacks and symptoms" (Tr. 759). However, the ALJ plainly acknowledged Dr. Benich's opinion that the plaintiff could only handle low stress jobs (Tr. 20, 759). Accordingly, the ALJ limited the plaintiff to "no work in a fast-paced production environment" with no contact with the general public and occasional contact with co-workers and supervisors (Tr. 14, 21). Thus, the ALJ properly accounted for the plaintiff's mental limitations, and the undersigned finds no error.

The plaintiff further argues that the ALJ "essentially ignored the existence of the CT scans" (pl. brief at 28). However, the ALJ specifically noted that the plaintiff "has moderate degenerative disc disease in the lumbar spine, which can be expected to cause some mechanical back pain but not to the extent that a cane or walker is required" (Tr. 20–21). Thus, the ALJ limited the plaintiff to light work, and this finding is supported by substantial evidence as discussed herein.

The plaintiff also argues that the ALJ failed to consider the opinion evaluation factors from the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). As discussed above, the ALJ gave adequate reasons for discounting Dr. Benich's opinions. Moreover, he substantively accounted for the regulatory factors. He

28

noted Dr. Benich was a primary care physician, and not a specialist (Tr. 15). He discussed the plaintiff's treatment with Dr. Benich and Dr. Benich's examinations (Tr. 15–17), and he analyzed the consistency and supportability of Dr. Benich's opinions (Tr. 19–20). Thus, the undersigned finds no error. *See Clontz v. Astrue*, No. 2:12-CV-00013-FDW, 2013 WL 3899507, at *7 (W.D.N.C. July 29, 2013) (finding that the regulations do not require the ALJ to specifically discuss every factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c)).

The plaintiff further argues that the ALJ erred in giving great weight to the State agency consultants' physical and mental assessments "based on review of admittedly incomplete and out-of-date records" (pl. brief at 26; *see* Tr. 20, 296-308, 322-28, 427-439, 441-48). The undersigned finds no error. An ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012). Here, the ALJ considered the entire record, and substantial evidence supports his determination to give great weight to the State agency consultants' opinions. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference

29

to conflicting opinions of non-treating physicians."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

As noted above, in discounting Dr. Benich's opinions, the ALJ noted, "Without a diagnosis, the physician is relying on the claimant's subjective complaints and limitations in completing forms" (Tr. 20). *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (ALJ may discount a treating source opinion based mainly on self-reports). The ALJ's finding that the plaintiff's subjective complaints, which were relied on by Dr. Benich, were not fully credible is also based upon substantial evidence (*see* Tr. 14-21). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the Court

in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The Court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595); *see also Johnson v. Barnhart*, 434 F.3d at 658; 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); and SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found the plaintiff's subjective complaints to be less than fully credible (Tr. 18, 21).  In doing so, the ALJ noted the following inconsistencies:

(1) The plaintiff left the neurology clinic angrily when told she did not have epilepsy (Tr. 15, 18, 19; *see* Tr. 351-52);

(2) The plaintiff repeatedly claimed to have "seizures," yet EEGs and brain MRIs were normal (Tr. 15, 16; *see* Tr. 267, 393, 394);

(3) Dr. Wannamaker in August 2011 concluded there was no clinical evidence to support the plaintiff's symptoms, calling her an "enigma" (Tr. 16 *see* Tr. 336);

(4) The plaintiff was told to stop taking anti-epileptic drugs, but kept doing so anyway (Tr. 16; *see* Tr. 38-41, 486);

(5) Dr. Kumar noted he could not tell if the plaintiff's tremor was "voluntary or involuntary," and his September 2011 exam was otherwise normal (Tr. 16; *see* Tr. 314-16);

(6) Dr. Meyer noted the plaintiff had poor participation in an audiogram and was concerned about "secondary gain" (Tr. 16–17; *see* Tr. 508);

(7) The plaintiff told Dr. Savage her first seizure was in his office, and she had to be reminded that she had earlier said she had a three year history of "seizures" (Tr. 17; *see* Tr. 467);

(8) Dr. Benich noted in March 2012 that, despite many exams and tests, there was no diagnosis to support the plaintiff's tremors and "seizures" (Tr. 17; *see* Tr. 489);

(9) In Dr. Wannamaker's March 2012 neurological exam, the plaintiff's gait was objectively normal, despite her claim that she needed a cane (Tr. 17; *see* Tr. 486);

(10) Dr. Wannamaker noted there were no objective findings to support the plaintiff's alleged  symptoms (Tr. 17; *see* Tr. 336–37, 342, 486);

(11) The plaintiff's mother told Dr. Wannamaker that the plaintiff was "getting along very well, ambulating normally without a walker" (Tr. 17; *see* Tr. 485);

(12) Dr. Wannamaker referred the plaintiff to mental health treatment, but the plaintiff refused to see any mental health professionals (Tr. 18; *see* Tr. 347, 486);

(13) Despite claiming she needed a cane or walker, no physician ever prescribed one (Tr. 18);

(14) Despite the plaintiff's allegedly disabling pain, exams were generally benign, and the plaintiff never appeared in extreme distress (Tr. 18; *see, e.g.*, Tr. 286, 341, 360-61, 477, 486, 500);

(15) Physical exams never found any sign of muscle atrophy, weakness, spasms, or weight change (Tr. 19);

(16) Despite claiming disabling pain, the plaintiff engaged in a range of daily activities, including caring for herself independently, doing housework, preparing simple meals, doing laundry, reading, riding in cars and walking, shopping, spending time with her parents, talking to her children, going to church, and socializing with church members (Tr. 19; *see* Tr. 51, 216-23), and

(17) The plaintiff alleged disabling mental problems, yet sought only medication prescribed by her primary care physician (Tr. 20; *see, e.g.,* Tr. 347, 352, 486).

The plaintiff first criticizes the ALJ's use of certain boilerplate language in the credibility analysis (pl. brief at 34). However, as argued by the Commissioner, such boilerplate is harmless where the ALJ explains his credibility analysis, as he did here. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

The plaintiff next argues that the "ALJ cites a couple of bizarre mis-readings of the record and his personal disagreements with the medical professionals to diminish [the plaintiff's] credibility" (pl. brief at 34). The plaintiff cites the ALJ's statement regarding her refusal to see a psychiatrist and instead see another orthopedist. However, the plaintiff did refuse to see a mental health specialist, despite her doctors' repeated urging (*see* Tr. 347, 352, 486). Accordingly, the undersigned sees no error in the ALJ's consideration of this fact. The plaintiff also argues the ALJ could not consider her use of Keppra medication after Dr. Wannamaker told her to stop, "especially since the neurologist stated that he felt the Keppra was helpful but was discontinuing it because [the plaintiff] wanted him to" (pl. brief at 34). To the extent the ALJ erred in considering this factor, the undersigned finds such error was harmless given the numerous other factors cited by the ALJ in his credibility

finding. *See Mickles*, 29 F.3d at 921 (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The plaintiff also argues the ALJ erred in considering her daily activities (pl. brief at 35). The plaintiff cites 20 C.F.R. § 404.1572(c) for the proposition that an ALJ may not consider daily activities in a credibility analysis. However, that regulation provides only that "we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." 20 C.F.R. §§ 404.1572(c), 416.972(c). It has nothing to do with credibility. In fact, daily activities are probative. *See Mickles*, 29 F.3d at 921.

Lastly, the plaintiff argues that "[d]ue to the lack of any valid explanations for his credibility findings, the ALJ's conclusions on this point are legally inadequate and require reversal" (pl. brief at 35).  As argued by the Commissioner, the ALJ cited many factors in his credibility analysis, and the plaintiff only disputes a few of the many factors the ALJ discussed.  Based upon the foregoing, the undersigned finds that substantial evidence supports the ALJ's finding.

Accordingly, the undersigned finds that the ALJ did not err in his assessment of the plaintiff's credibility or in his consideration of Dr. Benich's opinions.

***Severe Impairments***

An impairment is considered "severe" only if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (the "'mere presence of a condition is not sufficient to make a step-two showing'"; rather, the claimant must show "how it significantly limits her physical or mental ability to do basic work activities").   A non-severe impairment is defined as one that does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R.. §§ 404.1521(a), 416.921(a).  "Basic work activities" include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b).

The plaintiff contends that both the non-functioning kidney and the seizures are severe impairments (pl. brief at 30-32). Specifically, the plaintiff argues that the non-functioning kidney causes urinary incontinence, urinary frequency, and urgency (*id.* at 31). Both the plaintiff and Commissioner indicate that, although diagnosed in January 2012 as the result of the CT scan conducted after the plaintiff's motor vehicle accident, the kidney disorder had been a long-standing condition (*id.* at 30-31; def. brief at 21; *see* Tr. 423). The Commissioner contends that the ALJ properly concluded that, because the kidney condition was asymptomatic, it caused no significant limitations (def. brief at 22). The Commissioner also calls attention to the plaintiff's testimony that her bladder problems began after her "unrelated surgery" in July 2005 and argues that no doctor has said that her non-functioning kidney caused her bladder frequency (*id.*). The Commissioner states, "With no symptoms, there could not have been any limitations" (*id.*). The undersigned agrees. The ALJ specifically noted that Dr. Savage described the plaintiff's kidney disorder as "asymptomatic" (Tr. 12 n.1; *see* Tr. 465), which indicates no symptoms or limitations resulting from the non-functioning kidney. Here, the plaintiff has failed to show that the non-functioning kidney significantly limits her physical ability to do basic work activities, and thus the ALJ did not err in finding the condition was non-severe.

36

The plaintiff further argues that the ALJ erred in failing to find that her "seizures-like episodes" were a severe impairment (pl. brief at 30-32). The ALJ noted that the plaintiff alleged seizure-like events involving tremors occurring several times a week (Tr. 18, 20). However, as the ALJ correctly noted, the neurologists concluded that the plaintiff had no underlying neurological problems, and thus she was not having actual seizures (Tr. 17-20; *see* Tr. 352, 486). Instead, she appeared to have episodes of tremors and vertigo, which the ALJ accepted were severe impairments and assessed related RFC limitations (Tr. 14, 20-21). Moreover, as argued by the Commissioner, the plaintiff has failed to show the existence of a medically determinable impairment that would cause the alleged seizures. *See* 20 C.F.R. §§ 404.1505, 416.905. Based upon the foregoing, the ALJ did not err in failing to find the plaintiff's alleged seizure-like episodes were a severe impairment.

### *Residual Functional Capacity*

Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The plaintiff contends that the ALJ promulgated an RFC that failed to accommodate all of her limitations (pl. brief at 32).  Specifically, the plaintiff contends that the ALJ should not have discounted the opinions from her treating physicians indicating that she was precluded from work that required standing or walking for more than two hours a day (*id*. at 33).  The plaintiff also contends that ALJ failed to accommodate her need for hourly toilet breaks and her "tremors" (*id*.).  In response, the Commissioner contends that the ALJ's findings on RFC are supported by substantial evidence because the ALJ took into account the plaintiff's CT scan showing degenerative disc disease, the plaintiff's daily activities, and generally normal examination results (def. brief at 23).  The Commissioner also argues that ALJ relied on the opinions of physicians indicating that the plaintiff could perform light work and accounted for the plaintiff's "tremors" (*id*. at 23-24 (citing Tr. 21)).

The ALJ concluded that the plaintiff had the RFC to perform "light work, with the additional postural, environmental, and mental limitations supported by the documentation of the claimant's degenerative disc disease, asthma, vertigo, tremors, headaches, depression, and anxiety at [Exhibits] B5F, B8F, B10F, B11F, B20F, and B21F and the assessments of the State Agency medical consultant discussed in detail above" (Tr. 20).  The ALJ, in effect, found that the plaintiff could perform a *reduced* range of light work.

The ALJ's findings are consistent with the medical records.  For example, ALJ's Exhibit B5F consists of treatment notes (Tr. 284-295) from the Carolina Neurological

Clinic covering the period from December 1, 2009, to June 9, 2010. Although the treatment notes reflect the plaintiff's continuing "shake" on April 14, 2010, and on June 9, 2010 (Tr. 285-88), there was no weakness noted in the motor exam on June 9, 2010 (Tr. 286). ALJ's Exhibit B8F, the consultative report (Tr. 314-20) of Dr. Sanjay Kumar of September 30, 2011, shows normal flexion, normal range of motions, and no limitations of movements (Tr. 314-16). A range of motion test printed out on October 3, 2011, shows normal ranges of motion, except for the plaintiff's use of a cane (Tr. 317-18).

Moreover, a CT scan taken of the plaintiff's lumbar spine on January 14, 2012, one day after her motor vehicle accident, revealed disc bulges at L1-L2 and L2-L3, disc protrusions at L4-L5 and L5-S1, other degenerative disc problems, and the non-functioning kidney (Tr. 423-24). It was the ALJ's responsibility to determine the plaintiff's RFC, and he took into account the plaintiff's various conditions:

> Nevertheless, because of her degenerative disc disease, asthma, vertigo, tremors, headaches, depression, and anxiety, the claimant has received treatment and experienced some limitations. Therefore, the undersigned has limited the claimant to lifting and carrying 20 pounds occasionally and 10 pounds frequently, sitting, standing, and walking for 6 hours in an 8-hour work day, no climbing or balancing, no exposure to temperatures extremes, high humidity, unprotected heights, dangerous machinery or pulmonary irritants, simple repetitive tasks with no contact with the general public, occasional contact with coworkers and supervisors, and no work in fast-paced production environment, which is consistent with the above impairments.

> Although the claimant's allegations regarding her limited ability to work are not supported by the evidence of record, the undersigned has given the claimant the benefits of the doubt in taking in consideration the combination of her physical, postural, environmental, and mental restrictions and limited the claimant to the residual functional capacity as set forth above; however, due to the aforementioned inconsistencies in the record as a whole, the undersigned cannot find the claimant's allegation that she is incapable of all work activity to be fully credible. As discussed above, the claimant's daily activities are inconsistent with her allegations of disabling symptoms and

39

> limitations, but are fully consistent with the residual functional
> capacity described above.

(Tr. 21).  As set forth above, the ALJ specifically stated that he assigned limitations due, in part, to the plaintiff's tremors, including no climbing or balance, no exposure to unprotected heights or dangerous machinery, no contact with general public, occasional contact with coworkers and supervisors, and no work in a fast-paced production environment (Tr. 21).

The ALJ's findings with respect to the weight given to the various medical reports (Tr. 19-21) comply with the requirements set by the Court of Appeals in *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (ALJ must explicitly indicate the weight given to all of the relevant evidence). Although the medical records establish that the plaintiff suffers from numerous impairments, both severe and non-severe, it is the ALJ's responsibility "to reconcile inconsistencies in the medical evidence." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056–57 (4th Cir. 1976) ( "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence"). The ALJ gave "great weight" to the opinions of the State agency medical consultants, who opined that the plaintiff could do light work (Tr. 20).  Moreover, the ALJ followed Dr. Benich's recommendation regarding the plaintiff's lifting limitations, which were consistent with light work (Tr. 20; *see* Tr. 757).  The ALJ also relied on the opinions of the State agency psychological consultants, who opined that the plaintiff could do simple, repetitive, low stress work with no ongoing public interaction (Tr. 20).  The ALJ incorporated these limitations into the RFC finding (Tr. 14, 20).

Based upon the foregoing, the undersigned finds no error in the ALJ's RFC finding.  *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (Section 405(g) precludes *de novo* review, and requires a court to uphold the Commissioner's decision

"even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").

### *Vocational Expert Testimony*

The plaintiff contends that the ALJ erred by relying on the VE's testimony (pl. brief at 1).  The plaintiff states that the ALJ did not make accommodations for the plaintiff's need for hourly toilet breaks and tremors (*id*. at 33).  Specifically, the plaintiff contends that the tremors preclude her from performing the three jobs identified by the VE because she cannot perform jobs requiring frequent reaching, handling, and fingering (*id*. at 33–34).  In her reply brief, the plaintiff also contends that the hypothetical questions posed by the ALJ to the VE did not include her ability to reach, handle, or finger (pl. reply at 5).

In response, the Commissioner contends: (1) the VE testified that significant jobs existed in the national economy for someone with the assessed RFC (def. brief at 24); (2) the ALJ properly relief on the testimony of the VE to find the plaintiff not disabled at step 5 (*id*.); (3) "[t]o the contrary, the vocational expert's testimony was, itself, evidence that the jobs fit the RFC" (*id*.); (4) the plaintiff "raises no particular objections to the jobs, either now or at the hearing" (*id*.  at 24–25); (5) although "an obvious mismatch between the testimony and the *Dictionary of Occupational Titles* can require explanation[,] "[t]here is no sign of such inconsistency in this case" (*id*. at 25 n. 9); (6) and the ALJ posed a proper hypothetical question to the VE because the hypothetical reflected the RFC, and the RFC was supported by substantial evidence  (*id*. at 25).

In light of the ALJ's finding that the plaintiff could not perform a full range of light work, the ALJ properly received testimony from a VE.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985)(*per curiam*) ("As the grids may not alone support a denial of Hammond's disability claim, the [Commissioner] retains the burden of producing evidence that the national economy offers employment opportunities to Hammond.").

It is well-settled that the administrative fact-finder must pose to the VE questions that are consistent with the medical evidence, *see Hicks v. Califano*, 600 F.2d 1048, 1051 (4th Cir. 1979), and *Walker v. Bowen*, 889 F.2d 47, 49–51 (4th Cir. 1989), because a plaintiff must be capable of performing tasks as they exist in the national economy. *See Lester v. Schweiker*, 683 F.2d 838, 843–44 (4th Cir. 1982); and *Prevette v. Richardson*, 316 F. Supp. 144, 146–47 (D.S.C. 1970). The hypothetical questions, however, need only reflect those impairments that are supported by the record, and an ALJ is not required to include other restrictions not supported by the record. *See Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir. 1991) (noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.").

As discussed above, the ALJ's finding that the plaintiff has the RFC to perform a reduced range of light work is supported by substantial evidence. The hypothetical question properly reflected the RFC, and thus there was no error. *See Walker*, 889 F.2d at 50 ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.").

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 30, 2015
Greenville, South Carolina

42

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.**  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (*quoting* Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk of Court**
**United States District Court**
**300 East Washington Street — Room 239**
**Greenville, South Carolina 29601**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).